**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

KEITH BROWN,

Plaintiff,

v.

MICHAEL LESLIE, KEITH BARNES, and BEAU LIRETTE,

Defendants.

No. 1:24-cv-10854-JEK

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**KOBICK, J.**

Plaintiff Keith Brown was pulled over in the early morning of August 7, 2021 for speeding and for a marked lanes violation. After an officer handcuffed and frisked him, Brown was detained in the back of a police cruiser for approximately 45 minutes, during which time he was subjected to two additional searches before ultimately being released on a summons for operating a vehicle with a suspended license. Brown pleaded guilty in December 2021 to that criminal offense. He then filed this civil action against the three Massachusetts State Police Troopers involved in the investigation—defendants Keith Barnes, Michael Leslie, and Beau Lirette—alleging that they conducted unconstitutional searches of his body, and failed to intervene in their colleagues' unlawful searches, in violation of the Fourth and Fourteenth Amendments to the United States Constitution. The defendants have each filed motions for summary judgment. For the reasons that follow, Barnes' and Lirette's motions will be granted and Leslie's motion will be denied.

## BACKGROUND

The following facts are either undisputed or recounted in the light most favorable to Brown, as the non-moving party, where supported by record evidence. *Roberge v. Travelers Prop. Cas. Co. of Am.*, 112 F.4th 45, 51 (1st Cir. 2024).

### I. Barnes' Initial Stop and Investigation.

In the early morning of August 7, 2021, Trooper Barnes was patrolling the roads between Athol and Irving, Massachusetts. ECF 57, ¶ 1. Sometime before 1:45 a.m., while positioned on Route 2, Barnes witnessed a car driving faster than the posted speed limit of 55 miles per hour. *Id.* ¶¶ 7-9.[1] Barnes followed the car, which reached speeds of 80-85 miles per hour, failed to stay in its lane, and made "jerky movements" back and forth. *Id.* ¶¶ 10-11. As the car moved to exit Route 2, Barnes activated his emergency lights, and the car immediately pulled to the side of a road off the exit in Templeton, Massachusetts. *Id.* ¶¶ 12-13; ECF 61-1 (Barnes' Cruiser Dash Camera Footage), at 00:01:01.

At 1:49 a.m., Barnes exited his cruiser and approached the driver's side of the vehicle. ECF 42-7 (Barnes' Body Camera Footage), at 1:48:48-1:49:03. As he approached, the occupants could be heard yelling at each other. *Id.* When he knocked on the window, the driver—later identified as Keith Brown—lowered it, and the passenger—later identified as Jessica Frederick—sat quietly. *Id.* at 1:49:01. Brown was eating chips from a bag but otherwise kept his hands visible to Barnes. *Id.* at 1:49:06. After Barnes asked for their identifications, Frederick explained she had no ID on her and provided a false name. *Id.* at 1:49:12-1:49:20; ECF 57, ¶ 16. Recognizing her as someone he had previously arrested under a different name, Barnes confronted her about her identity. ECF

[1] The parties dispute whether Barnes also witnessed the same car driving above the speed limit earlier in the night, witnessed the car make a stop, and witnessed the driver and passenger get out before speeding off. ECF 57, ¶¶ 2, 5-6.

42-7, at 1:49:25. Meanwhile, Brown, unable to locate his wallet, alternated between quickly eating chips, feeling his pockets for his wallet, and putting his hands in the air or on the steering wheel. *Id.* at 1:49:30-1:50:24. Barnes briefly stepped away to shine a flashlight in the back of the car before returning to the driver's side window. *Id.*

Over the course of about five minutes, Barnes and Frederick asked Brown to locate his ID multiple times, and Brown repeatedly replied that he could not find his wallet and did not want it to appear as if he were reaching for something by looking around the car more thoroughly. *Id.* at 1:49:30-1:54:20. At times, Brown appeared agitated and exhibited frustration with Frederick for not understanding why he did not want to reach around the car. *See, e.g.*, *id.* at 1:50:15, 1:50:30. When asked by Barnes, Brown falsely stated that his name was Cedric Harris. *Id.* at 1:51:51; ECF 57, ¶ 16. Barnes suspected at that time that Brown had given him a false name. ECF 61, ¶ 8. Frederick, visibly frustrated with Brown, asked to exit the car. ECF 42-7, at 1:52:33. At that point, Frederick provided her true name and stated that there was a warrant out for her arrest. *Id.* at 1:53:02. Barnes then returned to questioning Brown, who continued to keep his hands on the steering wheel or otherwise within Barnes' view. Barnes asked Brown for his "real name," and Brown repeated that it was Cedric Harris. *Id.* at 1:53:09. After a brief exchange with Brown and Frederick about where they were coming from and whether he had seen them earlier that night, Barnes asked Brown if he had anything on him like a gun. *Id.* at 1:54:16. Brown replied that he did not. *Id.*

Just after 1:54 a.m., Barnes informed Brown that he was "gonna be in handcuffs for a minute," "just for my safety." *Id.* at 1:54:22. When Brown asked why Barnes was going to handcuff him, Barnes replied "cus I don't feel like fighting with you on the side of the road and you're not giving me your license." *Id.* at 1:54:25-1:54:54. When Brown asked what the probable

cause was, Barnes stated "cus you're obviously on something right now." *Id.* Barnes then repeated that Brown could either step out of the car to be placed be in handcuffs "until we figure this out" or be forcibly removed from the car by Barnes and his colleague, who was expected to arrive "in thirty seconds." *Id.* at 1:55:05. Although Brown appeared agitated about the prospect of being handcuffed, he responded calmly to Barnes. *Id.* at 1:54:25-1:56:06. During this interaction, Brown went back to eating chips but otherwise kept his hands in the air. *Id.* at 1:55:34. Barnes then asked Brown whether he had any guns, needles, or knives on his person. *Id.* at 1:55:45. Brown responded that he was not sure whether his knife was on his person or somewhere in the car. *Id.* at 1:55:56.

Shortly after, Barnes placed Brown in handcuffs and removed him from the car. *Id.* at 1:56:22-1:57:18. Brown complied with Barnes' instructions to facilitate the handcuffing and repeatedly stated, "I will cooperate." *Id.* Barnes then escorted him to the rear of the car and frisked him—shaking Brown's clothes and patting him down over the clothes. *Id.* at 1:57:25-1:57:49. While doing so, he asked Brown what he "uses," and Brown replied that he was just overtired. *Id.* at 1:57:30-1:57:51. As Brown was responding to his questions, Barnes felt and retrieved from Brown's back pocket a folded knife and a cylindrical metallic object that Barnes believed to be a crack pipe with residue, both of which he placed on the top of the car. *Id.* at 1:57:50-1:57:59; ECF 42-1, at 91:15-21.[2] Barnes then asked Brown whether he uses "dope," and Brown repeated that he was overtired. ECF 42-7, at 1:57:54-1:57:59. Barnes next removed Brown's hat and patted down Brown's front pocket, proceeding to reach inside and pull out multiple objects. *Id.* at 1:58:07. After removing those items, he said, "I thought you said you didn't use . . . you use something, you got

[2] Brown disputes whether this item was a crack pipe, noting that the item was not field tested, ECF 42-1, at 97; that no crack pipe was listed on Barnes' incident report, ECF 57-2; and that no crack pipe was identified on the motor vehicle inventory form, ECF 57-3. But Brown does not dispute that Barnes believed the item to be a crack pipe after pulling it out of Brown's pocket.

a crack pipe in your pocket right?" *Id.* at 1:58:18-1:58:22. Brown responded, "it's in my pocket, it ain't in my mouth." *Id.* Barnes next conducted a horizontal gaze nystagmus test on Brown, through which he determined that Brown was not under the influence of alcohol or drugs. *Id.* at 1:59:35; ECF 42-1, at 77. Barnes nonetheless asked Brown when he had last smoked crack, and Brown responded, "yesterday." ECF 42-7, at 2:00:05-2:00:13. When Barnes then asked, "you just carry that pipe around with you all the time?" Brown replied, "never leave home without it." *Id.* at 2:00:13-2:00:16. At 2:00 a.m., Barnes placed Brown in the rear of his cruiser while the investigation continued. *Id.* at 2:00:31.

## II. Leslie's Search of Brown.

With Brown secured in the back of his cruiser, Barnes asked Frederick if there was anything in the car, and she replied that "there might be a couple crack stems." *Id.* at 2:01:21. Barnes then handcuffed and frisked Frederick. *Id.* at 2:01:31. Trooper Lirette—who had just arrived on the scene—brought her to sit in the back of his cruiser. *Id.* at 2:02:40. Meanwhile, Barnes and Trooper Leslie—who arrived while Barnes was taking Brown out of his car—began searching the grassy area around the car. *Id.* at 2:02:50. Barnes informed Leslie that he believed Brown and Frederick had just dropped off drugs in Athol, and that Frederick had a history of trafficking drugs. *Id.* at 2:03:07. He also explained that while Frederick did not appear to have any drugs on her, she had previously "stuffed" (i.e., concealed in an anatomical cavity) 400 pills. *Id.* at 2:03:20.

With both Brown and Frederick detained, Barnes requested a tow truck and began to search the car. *Id.* at 2:03:50-2:04:02. He asked Leslie to help, informing him that "I think [Brown] just ripped out. There might be some dope in there." *Id.* at 2:05:53. When Leslie asked if Barnes thought Brown had drugs on his person, Barnes stated, "I don't know, he started pounding chips right when I did it and there's an open ripped bag that he was sitting on." *Id.* at 2:05:57-2:06:10.

Leslie replied that Brown "probably swallowed it," and Barnes said, "I don't know—I'm gonna check on him, make sure he's not—that's what I'm thinking though." *Id.*

At about 2:06 a.m., Leslie and Barnes approached Barnes' cruiser, and Leslie opened the door and asked Brown to step out of the car. ECF 42-8 (Leslie's Body Worn Camera Footage), at 2:06:15. Leslie asked Brown why he was sweating, and Brown explained that it was hot in the cruiser. *Id.* at 2:06:18. Leslie then had Brown widen his stance and, with gloves on, began a search of his person. *Id.* at 2:06:24. The entire search lasted 24 seconds. *Id.* at 2:06:24-2:06:52; ECF 59, ¶ 82. Leslie began by shaking Brown's three layers of shorts on his right, front, left, and back side. ECF 59, ¶ 65; ECF 42-8, at 2:06:24-2:06:40; ECF 42-4, at 57 (Brown was wearing cargo shorts over gym shorts and underwear). While doing so, he asked Brown why his pants were undone, and Brown provided an unintelligible response. ECF 42-8, at 2:06:27. When he came to the back side, he reached his hand in between Brown's legs and began searching Brown's intergluteal cleft (i.e., the crease between Brown's buttocks) over his three layers of shorts. *Id.* at 2:06:41. It is disputed whether Leslie's finger penetrated Brown's rectum or anus through his three layers of clothing.

Responding to the intergluteal cleft search, Brown exclaimed "Ow! Hey!" *Id.* at 2:06:43. Leslie, keeping his hand between Brown's legs, said "What is that? Tucked in your ass?" *Id.* at 2:06:45. Brown became agitated and said, "What is what? Hold up." *Id.* at 2:06:45-2:06:49. Leslie removed his hand from between Brown's legs and told him to relax. *Id.* at 2:06:50; ECF 59, ¶ 81. Brown, increasingly agitated, yelled at Leslie and accused him of sticking his finger "up [his] ass." ECF 42-8, at 2:06:51-2:06:58. Meanwhile, Leslie stepped away, remarking that Brown had "something stuck." *Id.* at 2:06:57. After Brown continued yelling at Leslie, Barnes and Leslie physically restrained him against the car. *Id.* at 2:07:00-2:07:30. Brown then insisted that he had nothing on him and told the troopers to pull his clothes off to check, declaring that Leslie should

strip search him rather than "poke [his] fucking ass with [his] fucking finger through [his] pants." *Id.* at 2:07:25. Leslie reiterated that "something [was] stuffed in [Brown's] ass" and that there was "definitely something there," but said they would search him at the barracks instead. *Id.* at 2:07:30-02:07:43. He then turned Brown around and guided him back into the cruiser. *Id.* at 2:07:45. Brown continued to yell at Leslie, demanding his name and stating he would press charges while Leslie walked away. *Id.* at 2:07:49-2:08:20. Lirette—who had approached moments before Leslie's search ended—remained with Brown.

Lirette introduced himself to Brown and asked for his name, to which Brown replied "Cedric Harris." ECF 42-9 (Lirette's Body Worn Camera Footage), at 2:08:19. Brown emphatically repeated that he had nothing on him and that Leslie had assaulted him. *Id.* at 2:08:22-2:13:00. During their conversation, Brown asked Lirette why he was going to be taken to the barracks because he had nothing on him, and Lirette replied that he did not know what charges were at issue. *Id.* at 2:08:44. Brown also revealed to Lirette and Barnes that he had previously served time for shooting a police officer. *Id.* at 2:10:36, 2:13:35. Lirette and Brown continued to converse until Lirette got Brown in the car, shut the door, and stepped away at about 2:22 a.m.

## III. <u>The Automobile Search and Trooper Deliberations.</u>

While Lirette spoke with Brown, Leslie and Barnes continued searching Brown's car. ECF 42-7, at 2:08:38; ECF 42-8, at 2:09:20. Leslie told Barnes that he could feel something sticking out of Brown's rectum. ECF 42-8, at 2:09:39. After looking for a few minutes, Leslie informed Barnes that he had found burnt Brillo from a crack pipe in the console. *Id.* at 2:11:30. Barnes walked away, but Leslie continued searching. ECF 42-7, at 2:11:41; ECF 42-8, at 2:11:42. Turning to the passenger side door, Leslie picked up an item and identified it as a crack pipe. ECF 42-8, at 2:12:24. Still searching, he said he could see another crack pipe, and he found a wallet containing

Brown's license. *Id.* at 2:12:33. He provided the license to Barnes before continuing to search the car and the various containers within it. *Id.* at 2:13:00-2:14:27. The license identified Brown as Keith Brown. *Id.*

At 2:17 a.m., after calling the station because all the cruisers' computers were down, Barnes confirmed that Brown had a suspended license. ECF 42-7, at 2:17:40. He could not otherwise locate Brown's criminal history. *Id.* at 2:37:32. He and Leslie then opened the trunk to Brown's car and searched it and the containers within it. *Id.* at 2:17:44-2:20:50. During the search, Barnes and Leslie discussed taking Brown to jail. *Id.* at 2:20:41.

Following the automobile search, Leslie asked Barnes if he wanted to take "all the crack pipes and stuff" out before the car was towed, but Barnes declined. *Id.* at 2:21:13. The three troopers then discussed whether they could take Brown and Frederick to the barracks together because policy forbade booking a male and female simultaneously. *Id.* at 2:25:26-2:34:26. They discussed, in the alternative, summonsing either Brown or Frederick and booking the other. *Id.* At times, they muted their body cameras while conversing. *See, e.g.*, *id.* at 2:31:30. Lirette proposed trying to get Brown to give up any drugs on him in exchange for a summons. *Id.* at 2:33:24. Barnes stated that he was unsure whether Brown had any drugs, to which Lirette replied that Leslie is typically good about identifying when someone has drugs on them. *Id.* at 2:33:25. They then discussed an approach where they would summons Brown after Lirette conducted a final search of his person and Brown gave up any drugs. *Id.* at 2:33:30.

When Lirette discussed the idea with Brown, Brown said that he would "strip right there." ECF 42-10 (Back Seat Camera of Keith Barnes' Cruiser) at 0:48:22. Lirette explained that road-side strip searches are forbidden but asked if Brown was willing to do one. *Id.* at 0:48:25-0:48:48. Brown confirmed that he was willing, suggested that they could do it in the bushes nearby, and

repeated that he had nothing on him. *Id.* at 0:48:49-0:49:07. Lirette then asked Leslie whether a roadside strip search was permissible with the detainee's permission, and Leslie indicated that it was not. ECF 42-9, at 2:36:02-2:36:20. Meanwhile, the cruisers' computers came back online, and Leslie departed shortly thereafter. *Id.* at 2:36:24-2:41:10.

**IV. <u>Lirette's Search of Brown.</u>**

At 2:41 a.m., approximately 45 minutes after Brown was first handcuffed, Barnes and Lirette told Brown that they intended to summons him for driving with a suspended license, contingent on Lirette conducting another search for drugs on Brown's person. *Id.* at 2:41:18-02:41:39. Brown said he was "good with that." *Id.* at 2:41:39. With Barnes standing nearby, Lirette then conducted an over-the-clothes search of Brown, using the "crush and squeeze method to check the crease of [Brown's] buttocks to ensure he [did] not have drugs concealed on his person." ECF 61, ¶ 34; ECF 42-9, at 2:42:29.

While Lirette was feeling between Brown's buttocks, Brown explained that he was wearing multiple pairs of shorts. ECF 42-9, at 2:43:08. After confirming that Brown had multiple pairs of shorts on, Barnes asked Brown, "you wanna take off the outer pair?" and Lirette paused his search to ask Brown to clarify, stating "you wanna take off the outer pair? You do?" *Id.* at 2:43:20. Brown replied, "yes, yes," and stated that what Lirette was feeling was the ridge of one pair of shorts beneath the outer pair. *Id.* at 2:43:21. Leaving Brown's clothing in place, Lirette continued feeling between Brown's buttocks. As he did, Brown told Lirette and Barnes to "just take the fuckin' shorts off." *Id.* at 2:43:29. Lirette then stepped away from Brown, such that neither he nor Barnes was in contact with Brown. *Id.* at 2:43:31.

After repeatedly telling the troopers to take the outer shorts off, Brown exclaimed, "I'll do it my fuckin' self" while moving to pull down his pants and shimmy his body, with the result that

all three layers of clothing came down below his buttocks to his ankles. *Id.* at 2:43:49. Lirette reacted, "whoa, whoa," and told Brown they wanted to pull up his pants. *Id.* at 2:43:50-2:43:59. Brown then leaned over, presenting his exposed buttocks to Lirette, who turned away. *Id.* at 2:44:04. Meanwhile, Barnes repeatedly told Brown to stop, and Lirette backed further away. *Id.* at 2:44:06. Neither Barnes nor Lirette conducted any further search, and Lirette asked Brown if he needed help pulling up his pants. *Id.* at 2:24:35; ECF 61, ¶ 37. They eventually uncuffed Brown, and Barnes gave him a courtesy ride to a 24-hour gas station. ECF 57, ¶¶ 37-38.

## V. **Procedural History.**

Brown was charged in the Winchendon District Court with operating a motor vehicle on a suspended license, in violation of M.G.L. c. 90, § 23, and two civil motor vehicle infractions—a marked lanes offense, in violation of M.G.L. c. 89, § 4A, and speeding, in violation of M.G.L. c. 90, § 17. ECF 57, ¶ 39. On December 15, 2021, he pleaded guilty to operating a motor vehicle with a suspended license and was found responsible for the civil infractions. *Id.* ¶ 40.

Brown brought this lawsuit in April 2024 against Barnes, Leslie, and Lirette, seeking compensatory and punitive damages. ECF 1-1, at 4-5. He claims, pursuant to 42 U.S.C. § 1983, that each trooper violated his Fourth Amendment right to be free from unreasonable searches. ECF 1-1, ¶¶ 26-31. He also claims that Barnes failed to intervene in Leslie's and Lirette's searches, in violation of his Fourteenth Amendment due process rights. *Id.* ¶¶ 28-29.[3] After a period of

[3] Brown also brought a negligence claim against the Commonwealth of Massachusetts, ECF 1-1, ¶¶ 32-38, but that claim was severed and remanded to Massachusetts Superior Court for lack of federal jurisdiction, ECF 13. In opposition to the defendants' motions for summary judgment, Brown for the first time alludes to allegations of "excessive force." *See* ECF 56, at 1, 8, 14-15, 22-23; ECF 58, at 1, 10, 12, 14; ECF 60, at 1, 14, 16. But Brown's complaint contains no claim for excessive force in violation of the Fourth Amendment, *see* ECF 1-1, ¶¶ 26-38, and "[p]laintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment,'" *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 431 (1st Cir. 2006)).

discovery, all three defendants filed motions for summary judgment. ECF 41, 44, 46. Following a hearing, the Court took the motions under advisement. ECF 67.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a rational factfinder could make as to the existence or nonexistence of a fact that has the potential to change the outcome of the suit." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quotation marks omitted). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit conclusory allegations, improbable inferences, and unsupported speculation." *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quotation marks omitted). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

### I. <u>The Favorable Termination Rule.</u>

Barnes and Lirette contend at the outset that this Court lacks jurisdiction over Brown's constitutional claims under 42 U.S.C. § 1983, because success on those claims would imply the invalidity of Brown's conviction for driving with a suspended license and his civil infractions. In *Heck v. Humphrey*, the Supreme Court "held that when a person convicted of a crime files a § 1983

claim seeking damages for an 'allegedly unconstitutional conviction' or for 'other harm,' the district court 'must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.'" *O'Brien v. Town of Bellingham*, 943 F.3d 514, 528-29 (1st Cir. 2019) (quoting *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)). Barnes and Lirette contend that this favorable termination rule bars Brown's claims in this Court, because success on his claims would imply the invalidity of his conviction insofar as they would "require a conclusion that his [guilty] plea" in the Massachusetts District Court "was taken without a factual basis in contravention of Mass. R. Crim. Pro. 12(c)(3)(B)" and would require "the suppression of all the evidence against him." ECF 43, at 7; *see* ECF 47, at 8-10. It is undisputed that Brown's conviction has not been vacated.

To determine whether Brown's claims would necessarily imply the invalidity of his conviction, this Court "must consider the relationship between the § 1983 claim[s] and the conviction, including asking whether [he] could prevail only by 'negat[ing] an element of the offense of which he [was] convicted.'" *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006) (quoting *Heck*, 512 U.S. at 486 n.6); *see Fairbanks v. O'Hagan*, 255 F. Supp. 3d 239, 244 (D. Mass. 2017). The crime to which Brown pleaded guilty, a violation of M.G.L. c. 90, § 23, ¶ 1, has the following elements: (1) the defendant operated a motor vehicle; (2) at the time of that operation the defendant's license was revoked or suspended; and (3) the defendant was notified that his license had been suspended or revoked. *See Commonwealth v. Deramo*, 436 Mass. 40, 50 (2002); Criminal Model Jury Instructions for Use in the District Court, § 5.200 (2009 ed.). To be held responsible for a marked lane infraction in violation of M.G.L. c. 89, § 4A, a driver can either fail to "maintain [his] intended lane of travel" or fail "to ascertain the safety of a movement from that lane before

executing that movement." *Commonwealth v. Larose*, 483 Mass. 323, 329 (2019). And to violate M.G.L. c. 90, § 17, the driver must be operating a motor vehicle "at a rate of speed greater than is reasonable and proper," or faster than the statutory or posted limit. *Commonwealth v. Whynaught*, 377 Mass. 14, 21 (1979). Barnes and Lirette do not identify which of these elements, in their view, would be negated if Brown were to succeed on his Section 1983 claims. Nor have they attached a transcript of Brown's plea colloquy in support of their contention that success on Brown's Section 1983 claims would imply that his guilty plea lacked a factual basis or would require suppression of evidence used against him.

The Court perceives no interrelation between Brown's conviction and his Section 1983 claims in this case. He alleges here that Barnes, Leslie, and Lirette violated his Fourth Amendment right to be free from unreasonable searches of his person, and that Barnes failed to intervene in his colleagues' unlawful searches of his body. Brown does not dispute that Barnes permissibly pulled him over for speeding and marked lane violations. Nor does he challenge the constitutionality of the search of his car, which led to the recovery of his wallet and license, allowing the troopers to identify him and learn that his license was suspended. *See* ECF 56, at 8 (outlining the scope of Brown's claims). Separately, Barnes' frisk of Brown led to the recovery of a knife and an object that Barnes believed to be a crack pipe. Neither of these items has any apparent connection to the elements of operating a vehicle with a suspended license or the civil infractions, nor is it clear how unlawfulness in the frisk would imply the invalidity of Brown's conviction. Brown was not, of course, charged with a drug or weapons offense. *See Evariste v. City of Boston*, No. 18-cv-12597-FDS, 2020 WL 1332835, at *3 (D. Mass. March 23, 2020) (*Heck* bar applied where success on claimed Fourth Amendment violation for an unlawful search, which had resulted in recovery of

drugs, would imply the invalidity of a conviction for possession of a controlled substance); *Mangual v. City of Worcester*, 285 F. Supp. 3d 465, 471-72 (D. Mass. 2018) (same).

The Supreme Court was "careful in *Heck* to stress the importance of the term 'necessarily.'" *Nelson v. Campbell*, 541 U.S. 637, 647 (2004). This Court sees no basis for concluding that success on Brown's Section 1983 claims here would necessarily imply the invalidity of his prior conviction, or that his claims and conviction are "so interrelated factually as to bar the § 1983 claim[s]." *Thore*, 466 F.3d at 180. Accordingly, the favorable termination rule enunciated in *Heck* does not preclude jurisdiction over Brown's claims.

## II. Fourth Amendment Claims.

Brown contends that each of the defendants violated his Fourth Amendment right against unreasonable searches of his person. He challenges Barnes' initial frisk that, he claims, morphed into a search; Leslie's subsequent search of his body and intergluteal cleft that, in his recollection, penetrated his anus or rectum; and Lirette's final search of his body, which he describes as a strip search. All three defendants maintain that their interactions with Brown comported with constitutional requirements. Leslie and Lirette further contend that they are entitled to qualified immunity.[4]

### A. Barnes' Frisk of Brown.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "Although as a general matter, warrantless searches [and seizures] are per se unreasonable under the Fourth Amendment, there are a few specifically established and well-

[4] Although Barnes raises qualified immunity as a defense to Brown's failure to intervene claim, he does not assert a qualified immunity defense against Brown's Fourth Amendment claim against him. The defense is therefore waived as to Brown's Fourth Amendment claim. *See Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) ("[W]e deem waived . . . claims adverted to in a cursory fashion, unaccompanied by developed argument.").

delineated exceptions to that general rule." *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010) (quotation marks omitted). One exception, known as a *Terry* stop and frisk, permits an officer who reasonably believes an individual "with whom he is dealing may be armed and presently dangerous" to temporarily detain the individual and "conduct a carefully limited search of the outer clothing of such perso[n] in an attempt to discover weapons which might be used to assault him." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In the context of a traffic stop, a *Terry* stop and frisk is permissible if (1) a police officer detains a vehicle because of a violation of the traffic laws, and (2) the officer "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Evaluating whether an officer's suspicions reasonably justify a frisk is a "fact-sensitive task which looks at the totality of the circumstances to determine whether there is a particularized, objective basis to suspect someone is armed and dangerous." *United States v. Harrington*, 56 F.4th 195, 203 (1st Cir. 2022) (quotation marks omitted). An officer conducting a permissible *Terry* frisk may reach beneath or within a suspect's outer clothing if, upon feeling an object, the officer reasonably suspects it to be a weapon. *United States v. Dubose*, 579 F.3d 117, 122-23 (1st Cir. 2009).

There is no dispute here that the *Terry* stop—Barnes' detention of Brown due to violations of motor vehicle laws—was valid. Barnes pulled Brown over after observing him driving faster than the posted speed limit and committing marked lane violations. The focus of the dispute is whether Barnes reasonably believed that Brown may have been armed and dangerous when he subjected Brown to a frisk. Barnes contends that his entire pat-down of Brown's body was justified by such a reasonable belief. Brown disputes that Barnes could have reasonably harbored a belief that he was armed and dangerous. But even if Barnes was initially justified in so believing, Brown contends, Barnes should have ceased conducting the frisk after removing Brown's knife from his

back pocket, and the continuation of the frisk after that point amounted to an unconstitutional search.

Based on the undisputed facts, Barnes was reasonably justified in suspecting that Brown may have been armed and dangerous, such that a protective frisk was needed to ensure officer safety.[5] When asked, Brown told Barnes that he had a weapon in his possession—a knife—but could not remember where it was located. Before the frisk, Barnes suspected that Brown had provided him with a false name, and he knew that Brown's passenger, Frederick, had also initially provided a false name and had a warrant out for her arrest. Brown acted erratically throughout the encounter by, among other things, quickly consuming chips out of a bag while Barnes was questioning him and responding to some questions with unintelligible answers. Brown failed to produce his driver's license, despite repeated requests from Barnes, and he became more agitated over the course of the five minutes preceding the frisk. Collectively, these facts would have led a reasonable officer to suspect that Brown possessed a weapon, as he admitted, and that he may have been dangerous. *See, e.g.*, *United States v. Cardona-Vicente*, 817 F.3d 823, 828 (1st Cir. 2016) (frisk justified where "[t]he driver of the car could not produce a driver's license, suggesting the [car] may have been stolen," the passenger "appeared nervous during the stop," and the driver "was clutching a fanny pack in a manner that, based on [the officer's] experience, was consistent with there being a gun inside"); *United States v. Mouscardy*, 722 F.3d 68, 75-76 (1st Cir. 2013) (frisk justified where passenger "repeatedly refused to identify himself," "refused to remove his hand from his pocket," and was increasingly "agitated and nervous"); *United States v. Herrera*,

[5] The parties disagree whether certain disputed facts—such as whether Barnes suspected prior to the frisk that Brown had served prison time in connection with shooting a police officer—support Barnes' conclusion that Brown may be armed and dangerous. The Court does not address or rely on any disputed facts, as the undisputed facts alone substantiate Barnes' reasonable conclusion that a protective frisk was necessary.

No. 17-cr-10112-ADB, 2018 WL 1020112, at *4 (D. Mass. Feb. 22, 2018) (defendant's possession of a knife provided reasonable suspicion that he was armed and dangerous and justified the frisk).

Brown contends that, even if the initial frisk was justified, Barnes violated the Fourth Amendment by continuing to search his person after discovering the knife in his back pocket. After removing the knife and the object he suspected to be a crack pipe, Barnes returned to frisking Brown and, upon reaching Brown's front pocket, felt its exterior with his left hand and then removed a piece of paper and other unidentified items with his right hand. As Brown sees it, because Barnes had already located the knife that Brown warned him about, Barnes could no longer possess a reasonable suspicion that he was armed and dangerous and could not justifiably continue to frisk him. That argument holds no water. Barnes' decision to continue frisking Brown upon discovering the knife was justified based on the same reasons his decision to frisk Brown in the first place was justified. The discovery of one weapon does not negate the possibility that Brown may have possessed other weapons that could have posed a risk to officer safety. *See Herrera*, 2018 WL 1020112, at *4 ("Given the presence of the knife, the pat frisk was a reasonable next step by law enforcement to confirm that Defendant did not possess any other weapons that could jeopardize the safety of the officers.").

Brown also argues that Barnes' pat-down surpassed the scope of a permissible *Terry* frisk and therefore required a different exception to the Fourth Amendment's prohibition against warrantless searches. In Brown's view, after Barnes removed the knife from his back pocket, Barnes impermissibly infringed his privacy rights by resuming the frisk and then retrieving various items from his front pocket, one of which was the suspected crack pipe. *See* ECF 56, at 12-13; ECF 57, ¶¶ 54-55. This argument is inconsistent with the body worn camera footage, which shows Barnes simultaneously removing two objects from Brown's back pocket: the knife and the

suspected crack pipe. *See* ECF 42-7, at 1:57:50-1:57:59.[6] Barnes then held both objects in front of the camera before placing them on the roof of the car. *Id.* Where, as here, the non-moving party's view of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Based on the camera footage, Barnes patted the exterior of Brown's shorts and, upon feeling hard objects in Brown's back pocket, reached in and retrieved the knife and the metallic object he believed to be a crack pipe. That retrieval did not exceed the scope of a permissible *Terry* frisk, because Brown had previewed that he may have a knife somewhere on his person, and Barnes could have reasonably suspected that one of those hard objects would have been a weapon. *See Dubose*, 579 F.3d at 122-23. And even if Brown were correct that one of the objects Barnes removed from Brown's front pocket was a crack pipe, that removal would not exceed the scope of a permissible *Terry* frisk, either. Having just removed from Brown's back pocket a folded knife and an object that appeared to be a crack pipe, a reasonable officer in Barnes' shoes, feeling a similarly sized bulge in a different pocket, would have been justified in suspecting that object to likewise be a weapon or contraband. Accordingly, Barnes' investigatory detention and frisk of Brown comported with constitutional requirements, and Barnes is entitled to summary judgment on Brown's Fourth Amendment claim against him.

B. Leslie's and Lirette's Searches of Brown.

After Barnes' frisk of Brown, Leslie and Lirette each searched his body, looking specifically for drugs. Although all agree that these officers conducted searches rather than *Terry* frisks, the parties part ways on three key issues. First, they dispute whether Leslie and Lirette had

[6] Brown testified at his deposition that when Barnes removed the putative crack pipe from his pocket, he "thought it was a flashlight at first," but he "believe[s]" it was a crack pipe, though he is not certain. ECF 42-4, at 149:21-150:3.

probable cause to search Brown for drugs. Second, they disagree whether Brown was under arrest at the time of the searches. The officers contend that their warrantless searches were permissible searches incident to Brown's arrest, as Brown was, at a minimum, under a *de facto* arrest for a potential narcotics offense. Brown contends that he was never arrested, and that the officers therefore cannot rely on the search incident to arrest exception to the warrant requirement. Third, the parties dispute whether, to the extent the officers' searches were justified, those searches were reasonable in scope. In the officers' view, no reasonable jury could conclude that their searches exceeded the bounds of reasonableness. Brown argues that a reasonable jury could conclude that Leslie's search penetrated his anal cavity and that Lirette strip searched him, such that neither officer's search was reasonable.

Leslie and Lirette also claim that qualified immunity shields them from liability on Brown's claims. Even when an individual has been subject to an unlawful search, a police officer may nevertheless be entitled to qualified immunity on constitutional claims for damages arising out of that search. The qualified immunity inquiry "proceeds with a now-familiar two-part test: '(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation.'" *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 8 (1st Cir. 2013)). "The 'clearly established' inquiry itself has two elements." *Id.* The first requires the court to consider "the clarity of the law at the time of the violation." *Id.* (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)). That element can be satisfied by finding binding or persuasive case law addressing similar facts, or a more general accepted proposition that applies with obviousness to the facts in question. *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 38-39 (1st Cir. 2024). The second requires the court to consider "the

facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Penate*, 944 F.3d at 366 (quoting *Drumgold*, 707 F.3d at 42). It is the plaintiff's "burden [to demonstrate] that the law was clearly established at the time of the alleged violation." *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015). A court may address either prong of the qualified immunity analysis first, and it need go no further if that inquiry is dispositive. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Where, as here, a defendant asserts a qualified immunity defense on summary judgment, the court must "identif[y] the version of events that best comports with the summary judgment standard and then as[k] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009).

*1. Probable Cause and Search Incident to Arrest.*

Police officers may arrest an individual without a warrant if they have probable cause to believe that he has committed or is committing a crime. *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009). If officers have probable cause to effectuate a warrantless arrest, they may, under the search incident to arrest exception to the warrant requirement, go beyond the pat-frisk permissible in an investigatory stop to "search 'the area into which an arrestee might reach in order to grab a weapon or evidentiary items.'" *United States v. Wurie*, 728 F.3d 1, 3-5 (1st Cir. 2013) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). The scope of such a search is limited: officers may search only "the arrestee's person and the area 'within his immediate control,'" meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763. This "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any

evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant*, 556 U.S. 332, 339 (2009).

The parties dispute whether Leslie and Lirette had probable cause to search Brown for drugs after Barnes had already frisked him. Officers have probable cause to conduct a warrantless search and arrest if, at that moment, "'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st Cir. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The probable cause inquiry calls for "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,'" and "not [of] the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).

Based on the undisputed facts, Leslie and Lirette had probable cause to believe that Brown was committing a drug-related offense and to search him for drugs. When Leslie commenced his search, Barnes had already frisked Brown and discovered a suspected crack pipe with residue in his pocket. Brown had told Barnes that he had last used crack cocaine the day before and that he "never leave[s] home without" the pipe. ECF 42-7, at 2:00:05-2:00:16. Brown had been driving with a woman whom Barnes knew to have a history of drug trafficking and who had previously been caught "stuff[ing]" pills in an anatomical cavity. *Id.* at 2:03:09-2:03:24. And she had told the officers that "there might be a couple crack stems" in Brown's car. *Id.* at 2:01:21. All of these facts would have led a reasonably prudent officer to believe that Brown had committed or was committing a controlled substances offense, and that Brown may have drugs on his body that were not uncovered during Barnes' frisk. *See United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002)

("[C]ommon sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop."). And that probable cause did not dissipate between Leslie and Lirette's searches, because Leslie's search was cut short due to Brown's objections, and Leslie believed he had felt narcotics tucked in Brown's intergluteal cleft during that search.

Having concluded that Leslie and Lirette had probable cause to search Brown for drugs, the next question is whether their searches were authorized under the search incident to arrest exception to the warrant requirement. Whether an individual suspected of committing a crime is under arrest is not always readily apparent. "There is no scientifically precise formula that enables courts to distinguish between investigatory stops, which can be justified by reasonable suspicion, and other detentions that the law deems sufficiently coercive to require probable cause—detentions that are sometimes called '*de facto* arrests.'" *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994). Courts must assess the totality of the circumstances, asking "whether a reasonable person in the [detainee's] shoes would understand [himself] to be subject to restraints comparable to those associated with an arrest." *Morelli*, 552 F.3d at 20. Relevant considerations include the use of physical restraints, the officers' demeanor, the information conveyed to the detainee during the stop, the length of the detention, and the surrounding environment. *See id*. at 20-21; *United States v. Rasberry*, 882 F.3d 241, 247-49 (1st Cir. 2018); *Zapata*, 18 F.3d at 975. That said, courts must "keep in mind that police conducting a *Terry* [investigatory] stop are entitled to take reasonable measures to protect their own safety and taking such measures does not transform a *Terry* stop into an arrest." *United States v. Jones*, 700 F.3d 615, 624-25 (1st Cir. 2012).

Whether Brown was subject to a *de facto* arrest matters because the search incident to arrest exception to the warrant requirement justifies the officers' searches if he was subject to a formal

or *de facto* arrest, but otherwise may not justify the searches. On the one hand, Brown's detention bears many hallmarks of a *de facto* arrest: he was handcuffed for most of the 45 minutes he was detained, his detention was not brief, multiple officers were present, and they restrained him in a police cruiser throughout much of the detention. On the other hand, the officers never told Brown that he was under arrest, they understood him to be detained rather than arrested, and they ultimately released him on a summons rather than taking him to the station for booking. But because the officers have asserted a qualified immunity defense, the Court need not determine whether Brown was subject to a *de facto* arrest on the night of August 7, 2021. That is so because qualified immunity will shield Leslie and Lirette from liability unless it was clearly established, as of that date, that the search incident to arrest exception is inapplicable where (1) the officers had probable cause to believe the defendant had committed a criminal offense, but (2) did not subject the detainee to a formal or *de facto* arrest.

Brown has not demonstrated "that the law was clearly established" on this issue "at the time of the alleged violation." *Mitchell*, 790 F.3d at 77. He contends only that "qualified immunity has no place in this case" because "[t]he law on searches and seizures is bedrock law and has been well established for many years." ECF 58, at 14; *see* ECF 60, at 16. But it is Brown's "heavy burden" to demonstrate that the contours of the Fourth Amendment "were sufficiently definite [such] that any reasonable official in [the defendants'] shoes would have understood that [they were] violating" his constitutional protections. *Mitchell*, 790 F.3d at 77. And Brown identifies no case law indicating that, in 2021, it was clearly established that a warrantless search of a person whom officers had probable cause to arrest, but did not ultimately subject to a formal or *de facto* arrest, violates the Fourth Amendment. Nor is the Court aware of any such precedent. Because Brown has not "identified a single precedent finding a [constitutional] violation under similar

circumstances," *City of Tahlequah v. Bond*, 595 U.S. 9, 14 (2021), or "demonstrate[d] that an objectively reasonable official in the defendant[s'] position[s] would have known that [their] conduct violated that rule of law," *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) (quotation marks omitted), Leslie and Lirette are entitled to qualified immunity on Brown's claims that their searches violated the Fourth Amendment's prohibition against warrantless searches.

*2. Reasonableness of the Officers' Searches.*

Brown next argues that even if Leslie's and Lirette's searches were justified, the officers nevertheless violated the Fourth Amendment because the scope of their searches exceeded the bounds of reasonableness.

Even when an officer may permissibly search a suspect, the nature of the search may offend the Fourth Amendment's protection against "unreasonable" searches. U.S. Const. amend. IV; *see Rasberry*, 882 F.3d at 246 (the Fourth Amendment "does not pretermit all searches and seizures, but only those that are unreasonable"). "The reasonableness of an invasive search depends on whether the totality of the circumstances justifies the degree of the intrusion." *Rasberry*, 882 F.3d at 250. With respect to Leslie's search, Brown contends that the search was unreasonably invasive because Leslie's finger penetrated his anal cavity. Leslie asserts that no reasonable jury could conclude that his finger penetrated Brown's rectum, nor that his non-penetrative search of Brown's intergluteal cleft was unreasonable. He further asserts that qualified immunity applies because Brown has failed to identify case law putting officers on notice that a non-penetrative search of a suspect's intergluteal cleft violates the Fourth Amendment in comparable circumstances. Leslie does not argue that qualified immunity would apply if a jury were to conclude that he had digitally penetrated Brown's rectum.

In evaluating material disputes of fact on summary judgment, the Court must draw all permissible inferences in favor of the non-moving party. And a reasonable jury, considering the undisputed record and drawing all inferences in Brown's favor, could conclude that Leslie's finger penetrated his rectum while Leslie searched his intergluteal cleft. Brown testified that Leslie's finger "penetrated [his] ass through his clothes" and "went into [his] anus." ECF 42-4, at 58-59. The body worn camera footage of the search captures Brown shouting "Ow! Hey!" and exclaiming that Leslie put his finger "up [his] ass." ECF 42-8, at 2:06:43-2:06:58. It shows Brown becoming immediately agitated and repeatedly accusing Leslie of "pok[ing] [his] . . . ass with [his] . . . finger through [his] pants." *Id.* at 2:07:25. Leslie denies Brown's version of the facts, arguing that no jury could conclude that penetration occurred where it is undisputed that Leslie "only searched over [Brown's] three layers of clothing and . . . was wearing gloves." ECF 45, at 11. While Leslie's hand was at all times separated from Brown's rectum by three layers of clothing—underwear, gym shorts, and cargo shorts—that fact would not preclude a jury from concluding that digital penetration occurred. Nor does Leslie's prior knowledge that people suspected of criminal conduct frequently dissemble compel the conclusion that Brown was feigning upset in this case. ECF 42-2, at 107:14-109:14. Because a reasonable jury could find Brown's account of the search credible, and Leslie does not dispute that such a search would be unconstitutional, Leslie is not entitled to summary judgment on Brown's Fourth Amendment claim. *See Spencer v. Roche*, 659 F.3d 142, 146 (1st Cir. 2011) ("Because individuals possess a strong interest in their bodily integrity, a nonconsensual intrusion into the body requires a particularly robust justification.").

With respect to Lirette's search, Brown contends that Lirette subjected him to an unreasonable strip search on the side of the road. Brown's argument is rooted in two alternative theories: first, that Lirette himself performed a strip search of Brown, or second, that Lirette

subjected Brown to such coercion that Brown felt compelled to remove his own shorts and allow the officers to visually inspect his buttocks. Disputing both theories, Lirette maintains that the body worn camera footage clearly refutes Brown's suggestion that Lirette removed his clothes and rebuts Brown's claim that he coerced Brown to remove his own clothes.

Brown's first theory is wholly inconsistent with the body camera footage, and no reasonable jury could conclude otherwise, even with all inferences drawn in Brown's favor. Contrary to Brown's contention that Lirette removed Brown's shorts and conducted a strip search, or ordered Brown to remove his shorts, it is indisputable that Brown removed his own shorts through his own bodily movements on his own initiative. *See Harris*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Indeed, when Brown told Lirette to remove Brown's shorts, Lirette immediately removed his hands from Brown's body and backed away. Brown then pushed down his shorts and shimmied his body such that all three layers of clothing fell to his knees and ankles. When Lirette immediately told Brown to relax and asked Brown if he wanted help pulling up his pants, Brown turned around, leaned over, and exposed his buttocks to Lirette, who backed away while Barnes told Brown to stop. After requesting consent to do so, Lirette helped Brown back into his pants without conducting any further search. Even viewing these facts in Brown's favor, no reasonable jury could conclude that Lirette conducted a strip search of Brown in violation of his Fourth Amendment rights.

Brown's second theory is more nuanced. He points out that, by the time his shorts had fallen to his ankles and his buttocks was exposed, he had been detained and handcuffed for 40 minutes; Lirette had asked him if he would consent to a strip search; he had overheard the troopers

debating whether they could perform a consensual strip search on the side of the road; he had already been frisked and searched for drugs, without the troopers recovering any from his person; and Lirette was subjecting him to yet another search of his intergluteal cleft. Under these circumstances, Brown contends, he experienced such coercion that he had no choice but to remove his shorts to prove to the officers that he was not concealing drugs in his buttocks. Lirette disputes that such circumstances can amount to coercion, let alone unconstitutional coercion. And he points out that he had probable cause to conduct a second search of Brown's intergluteal cleft, because Leslie's prior search of that area had been prematurely terminated, and Leslie felt confident that he had felt narcotics tucked in Brown's buttocks.

In general, First Circuit precedent recognizes that strip searches "impinge seriously upon the values that the Fourth Amendment was meant to protect," because they "require an arrestee not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others," sometimes in "degrading and humiliating positions." *Swain v. Spinney*, 117 F.3d 1, 6 (1st Cir. 1997). Accordingly, police officers may not conduct a visual body cavity search unless they have a "reasonable suspicion," specific to a suspect, that the suspect is concealing contraband in the cavity. *United States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007). But in the vast run of such cases, the officers direct the suspect to remove their clothing or forcibly remove the clothing for the suspect. *See, e.g.*, *id.* at 60-61 (officers ordered the suspected to remove his clothes, "turn around, bend over, and spread his buttocks so that the officers could see whether he had anything concealed in his anal area"); *Swain*, 117 F.3d at 4 (officer "ordered [the suspect] to remove all of her clothing except for her bra," then "made [her] bend over and spread her buttocks"). Brown has identified no case law in which the suspect chose to remove his own clothing and display his private areas without an order to do so from a police officer.

The Court does not foreclose the possibility that circumstances surrounding a warrantless search may become so coercive as to give rise to a valid Fourth Amendment theory similar to Brown's here. But because Lirette has raised qualified immunity as a defense, Brown has the burden to demonstrate that the law in 2021 clearly established that an officer can effect an unconstitutional strip search even when that officer does not remove, or order the suspect to remove, his clothing and display his private areas. *Mitchell*, 790 F.3d at 77. Brown has not met that burden, because he has not identified any case law involving comparable coercive circumstances, let alone case law demonstrating that a reasonable officer in Lirette's position would have known that he was violating Brown's Fourth Amendment rights. *See id.* Qualified immunity thus shields Lirette from liability, and he is entitled to summary judgment on Brown's Fourth Amendment claim against him.

**III. <u>Failure to Intervene Claim.</u>**

Brown also claims that Barnes violated his constitutional rights by failing to intervene in Leslie's allegedly unconstitutional search and in Lirette's alleged strip search. As to the former, Barnes argues that Brown's claim must fail as a matter of law because no reasonable jury could conclude that he had a reasonable opportunity to intervene in Leslie's search. As to the latter, Barnes asserts that no duty to intervene existed because the record reveals that no strip search occurred. Barnes further argues that, in any event, he is protected by qualified immunity because it was not clearly established in 2021 that a duty to intervene applies outside the context of excessive force by a fellow officer. Disagreeing, Brown contends that, because he was handcuffed and detained, Barnes had an affirmative duty to protect him from unlawful searches.

Agreeing with Barnes that qualified immunity bars Brown's claims, the Court bypasses the question whether Barnes had a duty to intervene and violated that duty. The First Circuit has

explained that a duty to intervene "arises in a variety of factual circumstances and the phrase by itself cannot determine either whether a duty arises or how claims of violation of the duty are to be evaluated." *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51 (1st Cir. 2005). To determine if a duty to intervene is clearly established in a particular context, the pertinent question is not whether a duty to intervene exists writ large, but instead whether the law would have put an officer in these particular circumstances on notice that he had a duty to intervene. *See id.* at 54. In August 2021, when the alleged constitutional violations occurred, cases in the First Circuit addressing duty to intervene claims "primarily, if not exclusively, concerned allegations of failure to intervene in the excessive force context." *Caldwell v. Cambra*, 802 F. Supp. 3d 8, 37 (D. Mass. 2025) (quotation marks omitted); *see Brown v. City of Brockton*, No. 24-cv-12048-ADB, 2025 WL 2677231, at *6 (D. Mass. Sept. 18, 2025) (collecting cases). And Brown has not asserted an excessive force claim against the defendants in this case. *See supra* note 3.

Brown does not point to any pre-2021 cases from the First Circuit imposing on government officials a duty to intervene in circumstances involving another government actor's unjustified or unreasonable search.[7] Because the clearly established inquiry is satisfied only if "controlling authority or a robust consensus of cases of persuasive authority" have "placed the constitutionality of the officer's conduct beyond debate," qualified immunity shields Barnes from liability for

[7] Brown relies on two inapposite cases to assert that Barnes had a duty to protect him. The first, *Davis v. Rennie*, deals with an excessive force claim brought by an involuntarily committed patient who was punched repeatedly in the head while being restrained. 264 F.3d 86, 92-94, 97-98 (1st Cir. 2001) (discussing plaintiff's "right to be free from the use of excessive force and the appellants' failure to prevent that force"). He also cites a case from the Third Circuit for the proposition that "[o]nce the state restrains an individual's liberty, rendering that individual unable to act for himself, . . . the state does acquire an affirmative duty to protect." *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir. 1990). That case, like *Davis*, deals with duties owed to individuals involuntarily committed and subject to physical abuse. Both are therefore inapplicable here.

failing to intervene in the unlawful searches allegedly conducted by Leslie and Lirette. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation marks omitted); *see Weichel v. Town of Braintree*, No. 20-cv-11456-IT, 2021 WL 1948096, at *6 (D. Mass. May 14, 2021) (duty to intervene not clearly established outside excessive force context); *Cosenza v. City of Worcester*, 355 F. Supp. 3d 81, 101 (D. Mass. 2019) (same); *Echavarria v. Roach*, No. 16-cv-11118-ADB, 2017 WL 3928270, at *11 (D. Mass. Sept. 7, 2017) (same).

**CONCLUSION AND ORDER**

For the foregoing reasons, Barnes' motion for summary judgment, ECF 41, is GRANTED; Leslie's motion for summary judgment, ECF 44, is DENIED; and Lirette's motion for summary judgment, ECF 46, is GRANTED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 3, 2026